IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

REC BOATS, LLC, a Louisiana limited liability company,

Plaintiff,

No. 03:11-cv-00652-HZ

v.

RP/PHL MARINE LEASING, INC., an Oregon limited liability company, and JOSEPH P. TENNANT, an individual,

Defendants.

OPINION & ORDER

Gordon T. Carey
Attorney at Law
1020 S.W. Taylor Street, Suite 375
Portland, Oregon 97205

Attorney for Plaintiff

/ / /

/ / /

Michael E. Haglund
Michael K. Kelley
HAGLUND, KELLEY, JONES & WILDER LLP
200 S.W. Market Street, Suite 1777
Portland, Oregon 97201

Attorneys for Defendant

HERNANDEZ, District Judge:

Plaintiff REC Boats, LLC, brings this fraud and negligent misrepresentation action against defendant RP/PHL Marine Leasing, LLC.[1] The claims arise out of plaintiff's purchase of the M/V MISS KATIE ("MISS KATIE") from defendant. Defendant moves for summary judgment on both claims. I grant the motion in part and deny it in part.

BACKGROUND

The MISS KATIE is a coastwise supply vessel servicing offshore oil fields in the Gulf of Mexico. Built in 1978, she was initially 124 feet long. She has a gross displacement of 87 tons. From 2006 until she was sold to plaintiff in 2009, the MISS KATIE was operated by Romeo Papa, LLC, a company that owns and operates vessels serving the oilfield trade and marine construction projects in the Gulf of Mexico. When Romeo Papa purchased the MISS KATIE in 2006, she did not have a "load line certificate." According to defendant, a load line indicates the draft of a ship and the legal limit to which it may be loaded for specific water types and temperatures.

Robert Perez is the managing officer of Romeo Papa. In 2008, Romeo Papa entered into a joint venture with Joseph Tennant to form defendant RP/PHL Marine Leasing. Pursuant to this

[1] Plaintiff originally sued both RP/PHL Marine Leasing and Joseph Tennant. The parties have stipulated to the dismissal of Tennant, leaving RP/PHL Marine Leasing as the sole defendant.

arrangement, defendant took ownership of Romeo Papa's vessels, including the MISS KATIE, and Romeo Papa continued to operate the vessels.

According to Perez, coastwise oil field support vessels such as the MISS KATIE must be inspected by the Coast Guard annually, and must receive a complete dry-dock inspection twice every five years. In June 2007, the Coast Guard completed a dry-dock inspection of the MISS KATIE and issued a new Certificate of Inspection which was valid until June 4, 2012. Ex. D to Perez Decl. However, during that 2007 inspection, Coast Guard Marine Inspector Gerald Philbrook determined that the vessel was deficient because it lacked a load line certificate. Philbrook issued a "CG-835" requiring the vessel's owner to provide a load line certificate to the satisfaction of an attending Coast Guard inspector before the next scheduled dry-dock inspection. Ex. E to Perez Decl. An entry made on the Coast Guard's "Activity Summary Report" for the vessel regarding the June 4, 2007 inspection and specifically, the load line certificate, reads as follows:

> Discussed with CID the fact that vessel had no loadline. The story is that when the vessel was built, no loadline was required due to the vessel being under 150 gross tons. However, vsl underwent major conversion hence "existing" vessel status is invalidated and 46 USC 5102 supercedes [sic] 46 CFR 42.03 & vessel is >79 FT. Now a loadline is required. Morgan City CID decided to give the vessel owner an 835 to provide a loadline cert prior to next scheduled drydocking. Ample time given to come into compliance, places owner on notice & gives MSU time to fully research to ensure 835 is judicious.

Ex. 17 to Carey Decl. at 3.

At the time the load line deficiency was issued, Perez told Philbrook that the vessel had been in service since it was built and a load line certificate had never required. Perez Depo. at 118. Philbrook explained during deposition that the 835 was issued because he believed the

exemption otherwise applicable to the MISS KATIE was lost when the vessel was lengthened in 1997 from 124 to 139 feet. Philbrook Depo. at 12-15, 18, 35. Philbrook spoke to his supervisor, Peter Zohimsky, before issuing the 835. Zohimsky Depo. at 16. Zohimsky agreed that Philbrook should issue the deficiency. Id. at 17.

On June 18, 2007, two weeks after Philbrook wrote up the 835 with the load line deficiency, Perez sent a letter to Zohimsky disputing the deficiency and explaining why he believed the load line certificate was unnecessary. Perez Decl. at ¶ 7; Ex. F to Perez Decl. There, Perez explained that

> I was issued an 835 on the M/V Miss Katie . . . by Gerald Philbrook on 04 June 2007[.] I have researched CFR 42.03-5(b)(1)(i), which states "Vessels engaged in domestic voyages by sea (1) All U.S. flag vessels which engage in domestic voyages by seas (coastwise and intercoastal voyages) shall be subject to the applicable provisions of this part except the following: (i) merchant vessels of less than 150 tons."
>
> The M/V Miss Katie is registered at 87 tons with the keel being laid before 1986. In my discussions with Mr. Philbrook, he mentioned a vessel of 79 ft or 150 gross tons would require a load line. In CFR42.03-10; it mentions these requirements but it pertains to foreign vessels entering the United States. This vessel was in fact modified from 120 ft to 135 feet but the tonnage remains under 150 tons. It also clearly states in CFR 42.03(1)(iii) existing vessels of less than 150 gross tons are exempt from the load line requirement. Therefore, I am requesting that you rescind the issued 835 at this time.

Ex. F to Perez Decl.

Perez received no response to this letter. In his opinion, this was not unusual and he assumed that the Coast Guard had rescinded the 835 deficiency. Perez Decl. at ¶ 7.

Zohimsky did not recall receiving Perez's June 18, 2007 letter. But, he was confident that someone in his department responded to the letter via email, letter, or telephone. Zohimsky Depo. at 16-18, 21. In his tenure, he always responded to inquiries like Perez's letter. Id. at 44-

45. Perez's letter would not have gone unanswered. Id. at 22-23.

Zohimsky recalls responding to a Freedom of Information Act (FOIA) request related to the 835 load line deficiency in this case. Id. at 24. He explained that the fact that his office's FOIA search did not uncover a response to Perez's letter does not establish that the Coast Guard never responded because there could be an email or telephone conversation note that was not recovered. Id. at 25-27. In Zohimsky's opinion, vessel owners who received 835 deficiency notices, especially those requiring load line certification on an existing vehicle, always want something in writing from the Coast Guard saying "[h]ey, I'm off the hook on this deal," due to the expense of compliance. Id. at 35-36.

Perez states that his assumption about the Coast Guard having rescinded the 835 was "verified" when, during the course of the June 2008 annual inspection, a few small deficiencies were noted, and corrected within eight days, and there was no mention of the load line certificate as an outstanding deficiency. Id. Perez never affirmatively followed up with the Coast Guard regarding the 2007 835 load line deficiency. Perez Depo. at 127-28, 131. Instead, after the 2008 inspection with no further mention of the 2007 835 load line deficiency, Perez "closed the book on it." Id. at 142.

The June 4, 2008 inspection was a "top side" inspection, not a dry-dock inspection. The inspector noted three minor repairs. Ex. 5 to Perez Decl. The form shows the repairs were made on June 4, 2008 and June 11, 2008. Id. The same form was used to record the repairs in 2008 as was used in noting the load line deficiency in 2007. Zohimsky explained that the form is actually a record of deficiency form and when a particular deficiency results in a CG-835 being issued, a box on the right is checked. Zohimsky Depo. at 48-50. None of the 2008 noted repairs

generated a CG-835.

Although Perez suggested in deposition that he thought it was "standard operating procedure" for marine inspectors to list any outstanding CG-835s on the deficiency form each time an inspection was performed, he did not confirm this assumption until the day before his deposition. Perez Depo. at 154-56. Zohimsky testified that an 835 load line deficiency exists until it is complied with or is rescinded. Zohimsky Depo. at 29. Such compliance or rescission is documented in writing. Id. at 29, 36. Further, Zohimsky testified that the load line requirement would not be noted on the 2008 deficiency form because it has "already been in there," referring to the Coast Guard's database, and these forms "aren't 835s." Id. at 49. In contrast to the load line 835, none of the noted repairs on the 2008 form would have gone into the Coast Guard's "MISLE" electronic database as 835s. Id. at 50.

Defendant sold plaintiff the "MISS KATIE" in December 2009. Negotiations for the sale were conducted in the summer of 2009 between Perez and Ronald Chaddock, plaintiff's president. A friend of Perez's named Andy Naquin testified that Perez approached him about selling three of his older boats, including the MISS KATIE, because Perez was moving in a "different direction" of obtaining bigger and newer boats with more sleeping capacity. Naquin Depo. at 7-9, 12. Because Naquin is also in the marine business, he passes on leads of possible buyers to Perez. Id. at 6, 7-9. In return, Naquin receives a commission. Id.; Chaddock Depo. at 80-81. Naquin knew Chaddock and brought to his attention that the MISS KATE was for sale. Chaddock Depo. at 13, 80.

Contrary to Naguin's testimony, Perez states that he did not tell Naquin that the MISS KATIE was for sale and instead plaintiff contacted Naquin first. Perez Depo. at 305-06. Perez

testified that he did not contemplate selling the MISS KATIE until after being contacted by plaintiff. Id.

After contacting Perez directly, Chaddock spent about 1.5 hours inspecting the MISS KATIE with Perez. Chaddock Decl. at ¶ 6. Perez told Chaddock the vessel needed a dry-dock inspection within a year. Id. Perez volunteered that the vessel was in "great shape," and that he had spent over $300,000 on shipyard work in the prior one to two years. Id. Chaddock thought the MISS KATIE appeared to be in good shape and he observed nothing to indicate that any substantial amount of work would be required. Id. Perez did not tell him during, or after, this inspection that the Coast Guard had issued a CG-835 deficiency requiring a load line survey and certificate or that the Coast Guard had allowed Perez and defendant until the next dry-dock inspection to comply with that requirement. Id. Perez did not tell Chaddock that Perez had contested the notice, that he disagreed with it, that he had written a letter about it, and that he had never received a response to that letter. Id. Perez did not tell Chaddock that Perez had reached a conclusion that the Coast Guard had rescinded the 835 without notice. Id.

Chaddock hired a marine surveyor, Perry H. Beebe & Associates, to inspect the MISS KATIE. Id.; Chaddock Depo. at 16-28. Beebe prepared a report that raised no issues concerning the load line. Chaddock Depo. at 27-28; Ex. A to Chaddock Decl.

Chaddock and Perez negotiated a sale price of $850,000. Chaddock Depo. at 19-20. They also agreed that plaintiff would charter the MISS KATIE for three months before the sale was final. Id.; Chaddock Decl. at ¶ 8; Perez Decl. at ¶¶ 2-3. Experiencing no problems during the charter period, plaintiff took title of the MISS KATIE on December 9, 2009. Chaddock Decl. at ¶ 8.

Before purchasing the MISS KATIE, neither Chaddock nor anyone with plaintiff's management team contacted the Coast Guard to check on the existence of any outstanding record of deficiency. Chaddock Depo. at 30-31. Plaintiff did not review the vessel's history of inspections and 835s, either at Romeo Papa's office in Houma, Louisiana, or through the Coast Guard's online database. Perez Decl. at ¶ 6; Chaddock Depo. at 30-31.

On May 27, 2010, the Coast Guard conducted a dry-dock inspection of the MISS KATIE. Zeringue Depo. at 21-22. At the inspection, the marine inspector asked Michael Zeringue, plaintiff's Vessel Coordinator, for the load line certificate and informed Zeringue of the outstanding 835 load line deficiency. Id. at 29; Chaddock Decl. at ¶ 9. This was the first time that plaintiff knew of the CG-835 requiring the load line survey and certificate and that it had been outstanding since the last dry-dock inspection three years earlier when the vessel was still owned and controlled by Perez and defendant. Chaddock Decl. at ¶ 10. Plaintiff was forced to request an extension beyond the dry-dock inspection to comply with the load line deficiency. Zeringue Depo. at 30. The Coast Guard granted the extension.

Chaddock talked to Perez who told Chaddock that the MISS KATIE was exempt from the requirement because she was less than 150 gross tons, despite having been lengthened. Perez Depo. at 230; Perez Decl. at ¶ 7; Chaddock Depo. at 43. Perez gave Chaddock a copy of the June 18, 2007 letter he wrote to the Coast Guard requesting that the 835 load line deficiency be rescinded.

Chaddock hired a naval architect, Dan Duplantis, to verify whether the 835 load line deficiency had been properly imposed on the MISS KATIE. Zeringue Depo. at 34-37. Duplantis spoke with the Coast Guard and independently reviewed the applicable federal regulations and

concurred with the Coast Guard's determination that the MISS KATIE needed a load line. Zeringue Depo. at 34, 36-37; Chaddock Decl. at ¶ 12.

Plaintiff spent approximately $1.1 million to obtain the load line certificate required to comply with the 835 load line deficiency. Chaddock Decl. at ¶ 13. Additionally, about $300,000 in profits were lost during the three months it took to perform the modifications to the vessel to bring it into compliance. Id.

STANDARDS

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial responsibility of informing the court of the basis of its motion, and identifying those portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).

Once the moving party meets its initial burden of demonstrating the absence of a genuine issue of material fact, the burden then shifts to the nonmoving party to present "specific facts" showing a "genuine issue for trial." Fed. Trade Comm'n v. Stefanchik, 559 F.3d 924, 927-28 (9th Cir. 2009) (internal quotation omitted). The nonmoving party must go beyond the pleadings and designate facts showing an issue for trial. Celotex, 477 U.S. at 322-23.

The substantive law governing a claim determines whether a fact is material. Suever v. Connell, 579 F.3d 1047, 1056 (9th Cir. 2009). The court draws inferences from the facts in the light most favorable to the nonmoving party. Long v. City & County of Honolulu, 511 F.3d 901,

905 (9th Cir. 2007).

If the factual context makes the nonmoving party's claim as to the existence of a material issue of fact implausible, that party must come forward with more persuasive evidence to support his claim than would otherwise be necessary. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

DISCUSSION

I. Fraud Claim

To establish a fraud claim in Oregon, plaintiff must show that (1) defendant made a material misrepresentation that was false; (2) defendant did so knowing that the misrepresentation was false; (3) defendant intended that plaintiff rely on the misrepresentation; (4) plaintiff justifiably relied on the misrepresentation; and (5) plaintiff's reliance on that misrepresentation was the cause of damages. Strawn v. Farmers Ins. Co. of Or., 350 Or. 336, 351-52, 258 P.3d 1199, 1209 (2011), cert. denied, 132 S. Ct. 1142 (2012); see also Knepper v. Brown, 345 Or. 320, 329, 329 n.5, 195 P.3d 383, 387 n.5 (2008) (noting older cases listing nine elements of common-law fraud, and more recent cases using a more abbreviated list of elements). Plaintiff must establish the elements of its fraud claim by clear and convincing evidence. Webb v. Clark, 274 Or. 387, 391, 546 P.2d 1078, 1080 (1976).

Defendant argues that plaintiff's fraud claim fails because plaintiff cannot establish (1) that Perez made any knowing misrepresentation to plaintiff; (2) that plaintiff's reliance was justifiable; and (3) that any alleged misrepresentation caused plaintiff's damages.

A. Knowing Misrepresentation

Fraud may be committed by the concealment of material facts as well as by an affirmative

misrepresentation. Ogan v. Ellison, 297 Or. 25, 34, 682 P.2d 760, 765 (1984) ("Actionable fraud may be committed by a concealment of material facts as well as by affirmative and positive misrepresentations") (quoting Musgrave v. Lucas, 193 Or. 401, 410, 238 P.2d 780, 784 (1951)). Plaintiff must show that any "misrepresentation was made with knowledge of its falsity or with reckless disregard for the truth[.]" Bixby v. KBR, Inc., No. 3:09-cv-00632–PK, 2012 WL 3862726, at *14 (D. Or. Sept. 4, 2012). Similarly, an alleged omission must have been done knowingly or recklessly.

Defendant argues that the evidence shows that, at the time Perez was negotiating the sale with Chaddock, Perez believed that the load line deficiency had been rescinded. Given that he wrote to the Coast Guard to challenge the 835 after it was issued, heard nothing more, and did not see it on the 2008 inspection report, Perez reasonably and accurately understood that there was no outstanding 835 load line deficiency at the time he sold the vessel. Defendant contends the evidence is capable of only one conclusion: Perez did not misrepresent the condition of the MISS KATIE, knowingly or otherwise, because there was no reasonable basis for Perez to believe that the 835 load line deficiency was an outstanding issue.

Examining the evidence in a light most favorable to plaintiff, I disagree with defendant. Zohimsky's testimony creates a factual dispute as to whether someone in the Coast Guard may have responded to Perez's letter by email or telephone. Zohimsky's testimony also creates an issue as to the reasonableness of Perez's assumption based on his "experience" that hearing nothing back from the Coast Guard meant that it rescinded the 835. And, Zohimsky's testimony creates an issue as to the reasonableness of Perez's reliance on the fact that the 2008 deficiency notice did not mention the outstanding 835 load line deficiency. Zohimsky's testimony creates

issues of fact regarding Perez's credibility and the reasonableness of the assumptions he made regarding the Coast Guard's conduct.

Additionally, a reasonable juror could understand Naguin's testimony that Perez approached him about selling the older boats, including the MISS KATIE, to suggest that Perez, knowing about the load line problem, wanted to get rid of the MISS KATIE before having to spend money on the repairs. The testimony is capable of undermining Perez's claim that he thought the issue was resolved.

Perez's credibility regarding his belief that the 835 had been rescinded is determinative. If the jury finds that his assumptions were unreasonable, then the jury could conclude that Perez knew the load line issue was outstanding and knowingly withheld the information about the 835, or at least acted recklessly. Assessing Perez's reasonableness is a jury question. Summary judgment to defendant on this issue is denied.

B. Justifiable Reliance

Whether a plaintiff alleging fraud was justified in relying on an alleged misrepresentation or omission is generally a question of fact for the jury. See Malmquist v. OMS Nat'l Ins. Co., No. 03:09-cv-01309-PK, 2010 WL 5621358, at *11 (D. Or. Dec. 28, 2010) (whether plaintiffs' reliance was reasonable was question for the jury). The reasonableness of a plaintiff's reliance is "measured in the totality of the parties' circumstances and conduct." Or. Pub. Empees Ret. Bd. v. Simat, Helliesen & Eichner, 191 Or. App. 408, 428, 83 P.3d 350, 361 (2004). "Justifiable reliance requires a 'right to rely,' which is acquired by taking reasonable precautions to safeguard one's own interests." Gregory v. Novak, 121 Or. App. 651, 655, 955 P.2d 1142, 1144 (1993).

Defendant argues that plaintiff's failure to examine the Coast Guard records, either at

Romeo Papa's offices or via the Coast Guard's database, was not reasonable and precludes a claim of reasonable reliance. Defendant further argues that a disclaimer in the sales agreement negates any reasonable reliance by plaintiff.

Defendant relies on Coy v. Starling, 53 Or. App. 76, 81, 630 P.2d 1323, 1326 (1981), where the plaintiffs, who had purchased a motel from the defendants, sued the defendants for fraud after learning that the annual gross income of the hotel was $15,000 less than had been represented and that the annual expenses were $4,000 more than had been represented. The court of appeals affirmed the trial court's directed verdict in favor of the defendants. The court explained that

> [t]his was an arm's length transaction. Plaintiffs owned property and were familiar with accounts and bookkeeping. They had sufficient experience in business to know that the motel's financial records should be examined. They declined to examine the books and records which were offered to them by the sellers, and they even failed to review the records provided by the sellers which they themselves had requested. Furthermore, they were aware defendants had not operated the motel for a full year, and plaintiffs therefore knew the representation of annual gross income given by defendants was necessarily an estimate. They knew, or should have known by the exercise of reasonable care, that the expense estimate did not contain data on laundry expenses, even though they were aware there were such expenses.

Id.

Defendant argues that as in Coy, plaintiff here is an experienced maritime operator of coastwise vessels in the Gulf Coast oil trade. And, as in Coy, plaintiff failed to undertake a meaningful investigation of the vessel's documents, the status of her inspections, or the history of her inspection certificates. Accordingly, defendant argues that as in Coy, plaintiff cannot establish that its reliance on any alleged omission by Perez was justified.

I disagree with defendant because unlike in Coy, the evidence here is that plaintiff did do

some investigation of the MISS KATIE before purchasing it, including personally inspecting the vessel during Chaddock's 1.5 hour walk-through with Perez, hiring the marine surveyor to do an assessment and inspection, and chartering the vessel for three months before finalizing the purchase. Plaintiff's failure to review records must be examined in the context of the investigation plaintiff actually did.

As to the disclaimer argument, the Purchase and Sale Agreement contains the following disclaimer:

> REC represents and warrants to RP/PHL that it has made an inspection of the MISS KATIE that is as thorough as it desires. Other than as set forth in Section 1.2 above, RP/PHL NEITHER HAS MADE NOR SHALL MAKE ANY REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, AS TO ANY OTHER PARTICULARS, THE ADMEASUREMENT, THE GROSS OR NET TONNAGES, OR THE SEAWORTHINESS, FITNESS FOR A PARTICULAR PURPOSE, USAGE OR TRADE; OR MERCHANTABILITY OF THE MISS KATIE; THE MISS KATIE SHALL BE CONVEYED AS IS, WHERE SHE LIES, AND WITH ALL FAULTS, WHETHER KNOWN OR UNKNOWN, AND WHETHER LATENT OR OBVIOUS. NO MARINE SURVEYS, REPORTS OF CONDITION OR TESTS, VESSEL SPECIFICATIONS, OR INVENTORIES NOT SET FORTH HEREIN WHICH RP/PHL MAY HAVE GIVEN TO REC OR TO ANY OTHER PARTY SHALL BE DEEMED TO BE REPRESENTATIONS OR WARRANTIES OF RPH/PHL; WITH RESPECT THERETO, REC HAS ELECTED TO RELY EXCLUSIVELY ON ITS OWN INSPECTION OF THE MISS KATIE. The provisions of this section have been specifically negotiated in lieu of a higher sale price.

Ex. A to Perez Decl. at ¶ 2.4.[2]

Defendant argues that this disclaimer defeats any argument by plaintiff that its reliance was reasonable, Defendant relies on Wagner v. McNeely, 161 Or. App. 215, 984 P.2d 943

---

[2] Section 1.2, referred to in the second sentence of the warranty, does not exist. The attorney who represented plaintiff in the sale negotiations explains that this was a scrivener's error contained in the draft prepared by defendant and the reference should be to "Section 2.2." Pusateri Decl. at ¶ 5.

(1999), where the buyer of timber sued for fraud when the amount of timber was substantially less than the buyer had anticipated. The sales contract listed an estimated volume of merchantable logs at 780,000 board feet based on a cruise conducted by an agent of the seller's. However, there was express language in the contract which stated:

> Seller in no way represents, warrants or guarantees such amount. Buyer has inspected the Contract Area and acknowledges that the actual volume of Covered Products may be more or less than the estimated volume. Buyer acknowledges he has completely inspected the above described Contract Area and is satisfied as to its boundaries and Covered Products located thereon.

Id. at 217, 984 P.2d at 944. With no discussion, the appellate court dispensed of the fraud claim by stating that it was "defeated by the express disclaimer of representations or guarantees of the estimated volume in the negotiated arm's-length contract between the parties." Id. at 219, 984 P.2d at 945. Defendant contends that as in Wagner, plaintiff's claim is defeated by the disclaimer or at least that the disclaimer put plaintiff on notice of the need to inquire as to the vessel's condition in those respects.

As plaintiff notes, the "effect of [a] disclaimer with reference to justifiable reliance is a jury question." Knepper, 182 Or. App. at 605, 50 P.3d at 1215. Additionally, plaintiff points to the exception in the disclaimer for any representations made in section 2.2. That paragraph provides, in part, that "RP/PHL represents and warrants that the MISS KATIE is, and shall be when the interest conveyed herein is conveyed, eligible to be documented for the coastwise trade of the United States of America." Ex. A to Perez Decl. at ¶ 2.2. Despite this affirmative representation, plaintiff states the MISS KATIE was not, in fact, eligible for coastwise trade without a load line certificate. Thus, plaintiff argues, this disclaimer cannot, as a matter of law, preclude reasonable reliance by plaintiff.

According to defendant, section 2.2 excepts from the disclaimer only representations regarding the eligibility of the vessel for documentation and nothing more. Defendant argues that the exception in section 2.2. does not, therefore, affect the applicability of the disclaimer to the load line requirement.

Even if I interpret the disclaimer and the exception in section 2.2 as suggested by defendant, I deny summary judgment to defendant on this issue. I agree with defendant that the disclaimer is relevant to a determination of plaintiff's justifiable reliance. However, while plaintiff's failure to inspect the records combined with the disclaimer makes this a close question, when all the facts are reviewed in a light most favorable to plaintiff, given that plaintiff did conduct some investigation regarding the vessel, a reasonable juror could conclude that plaintiff's reliance was justifiable.

C. Plaintiff's Damages

Damages are proximately caused by a misrepresentation when they can be reasonably expected to result from reliance on the misrepresentation. Knepper, 345 Or. at 330-31, 195 P.3d at 388. Defendant contends that plaintiff could have avoided the $1.1 million cost for the load line modifications to the MISS KATIE by challenging the Coast Guard's assertion that the vessel required a load line certificate. Defendant relies on the opinion of its expert, Michael Brown, a former Coast Guard inspector in Louisiana who served for three years as the Chief of the Marine Safety Compliance Branch for the Eighth Coast Guard District which covers twenty-six states, including Louisiana. Brown Decl. at ¶¶ 3, 4.

According to Brown, Philbrook and Zohimsky mistakenly concluded that the MISS KATIE lost her exemption from the load line requirement as a result of being lengthened by

fifteen feet in 1987 because the vessel remained a United States flag vessel, engaged in domestic voyages, and was under 150 gross tons. Id. at ¶ 8; see also Id. at ¶¶ 6, 7 (citing a section of 46 C.F.R § 42.01-10 and concluding that vessels such as the MISS KATIE are "clearly exempt" from the load line requirement set forth in this regulation). Id. at ¶¶ 6, 7. Based on Brown's opinion, defendant argues that had plaintiff challenged the Coast Guard position's regarding the load line deficiency, plaintiff would have prevailed. As a result, there is no causal link to the damages plaintiff incurred to repair the vessel.

Plaintiff challenges the admissibility of Brown's opinion as an improper opinion on the law. Nationwide Transp. Fin. v. Cass Info. Sys. Inc., 523 F.3d 1051, 1058 (9th Cir. 2008) ("an expert witness cannot give an opinion as to her *legal conclusion*, i.e., an opinion on an ultimate issue of law") (internal quotation marks omitted). I need not resolve the evidentiary issue at this juncture because even if Brown's opinion is not excluded, plaintiff still creates an issue of fact regarding whether its repair costs were reasonably incurred. Plaintiff knew that Philbrook had already issued the 835, representing his conclusion that the load line was required. Then, plaintiff's naval architect separately concluded that the Coast Guard was correct in ordering the load line survey and certification. At the time plaintiff incurred the repairs costs, plaintiff was faced with a determination from the Coast Guard and naval architect on the one hand, and Perez's opinion on the other. Thus, there was at least a difference of opinion about the law. This creates an issue of fact as to the reasonableness of plaintiff's repair expenses.

Additionally, even assuming Brown is correct and that a load line certificate is not required under the applicable regulations, damages are proximately caused by an alleged misrepresentation or omission when they are reasonably expected to result from reliance on that

misrepresentation. It is for the jury to determine if plaintiff's decision to proceed with repairs was reasonable in light of what appears to be a debatable legal issue. Moreover, as plaintiff noted at oral argument, if plaintiff had appealed, as defendant suggests it should have done, plaintiff would have incurred legal expenses and would have lost the use of the vessel and the income it generated pending the outcome of that appeal. These facts are also relevant to a determination of the reasonableness of plaintiff's repair expenses. I deny summary judgment to defendant on the damages issue.

II. Negligent Misrepresentation Claim

Defendant moves for summary judgment against the negligent misrepresentation claim because Oregon law does not permit recovery for economic losses arising from an arm's length transaction based on a negligent misrepresentation theory. Onita Pac. Corp. v. Trs. of Bronson, 315 Or. 149, 161-62, 843 P.2d 890, 897 (1992) ("in arm's-length negotiations, economic losses arising from a negligent misrepresentation are not actionable"); see also Conway v. Pac. Univ., 324 Or. 231, 237, 924 P.2d 818, 822 (1996) (negligent misrepresentation requires that one party in a relationship owe a duty beyond the common law duty to exercise reasonable care to prevent foreseeable harm to the other party; requiring "special relationship" between the parties for one of them to be liable to the other for damages arising from negligent misrepresentation).

Plaintiff argues that its negligent misrepresentation claim is not barred by the Onita Pacific economic loss rule because the Purchase and Sales Agreement created a special relationship between the parties that imposes a duty beyond the common law reasonable care standard. Plaintiff states that the provision in the purchase and sales agreement in which defendant represented and warranted that the MISS KATIE is, and "shall be when the interest

conveyed herein is conveyed, eligible to be documented for the coastwise trade of the United States of America[,]" imposed a duty on defendant to ensure that the MISS KATIE was eligible for coastwise trade.

Paul v. Providence Health Sys.-Or., the case plaintiff relies on, is not on point because it generally states that a "duty to protect against economic loss can arise from a defendant's particular status or relationships, or from legislation" and does not hold that language in a contract can create a special relationship. 351 Or. 587, 593, 273 P.3d 106, 110 (2012) (internal quotation marks omitted). In fact, Conway expressly held that for "tort liability to be imposed, however, a tort duty must exist independent of the contract and without reference to the specific terms of the contract. That duty in tort does not arise from the terms of the contract, but from the nature of the parties' relationship." Conway, 324 Or. at 237-38, 924 P.2d at 822 (internal quotation marks and citations omitted).

Plaintiff's argument would turn every warranty provision in a sales contract into an extra-contractual duty, capable of creating a special relationship supportive of tort damages in an otherwise arm's-length sales contract. Conway makes clear that this is not the law in Oregon. Plaintiff fails to show that an extra-contractual duty created a special relationship between the parties.

Finally, plaintiff argues that its $1.1 million in damages are repair costs, not economic damages subject to the economic loss rule explained in Onita. I reject this argument. Onita, 315 Or. at 159 n.6, 843 P.2d at 896 n.6 ("the term 'economic losses'" is used "to describe financial losses such as indebtedness incurred and return of monies paid, as distinguished from damages for injury to person or property"). Plaintiff does not allege any damage to person or property and

as a result, its damages are properly considered "economic losses" subject to the economic loss doctrine as explained in Onita.

CONCLUSION

Defendant's motion for summary judgment [32] is denied as to the fraud claim, and is granted as to the negligent misrepresentation claim.

IT IS SO ORDERED.

Dated this 26 day of Dec., 2012

Marco A. Hernandez
United States District Judge